IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 8:08CR361 |
| | ) | |
| vs. | ) | REPORT AND |
| | ) | RECOMMENDATION |
| JERRY J. MEYSENBURG, | ) | |
| | ) | |
| Defendant. | ) | |

   This matter is before the court on two separate motions to suppress by defendant Jerry J. Meysenburg (Meysenburg). **See** Filing Nos. 18, 23.   Meysenburg filed a pre-hearing brief in support of his motions. **See** Filing No. 24.  Meysenburg is charged in the Indictment with the receipt and distribution of child pornography, in violation of 18 U.S.C. § 2252A(a)(2), and with possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B).  **See** Filing No. 1 - Indictment.  Meysenburg seeks to suppress all statements made to law enforcement officers on August 4, 2008, and all evidence obtained by searching his computer on July 15, 2008.  **See** Filing Nos. 18, 23.

   On February 2, 2009, the court held an evidentiary hearing on Meysenburg's motions. Meysenburg was present with his counsel, Adam J. Sipple.  The United States was represented by Assistant U.S. Attorney Michael P. Norris.  The court heard testimony from Nebraska State Patrol (NSP) Investigators Scott Haugaard (Investigator Haugaard), Kent Hanlin (Investigator Hanlin) and James Hitz (Investigator Hitz), and Daniel Meinke (Meinke) and Meysenburg.  The court received into evidence: an affidavit and application for issuance of a search warrant, the search warrant, and return and inventory (Exhibit 1); first browse check report (Exhibit 2); LimeWire.props file (Exhibit 3); virus and trojan scan report (Exhibit 5); LimeWire Search Information report (Exhibit 6); and an audio disc of the interview of Meysenburg conducted on August 4, 2008 (Exhibit 101).  The transcript of the hearing (TR.) was filed on February 11, 2009.  **See** Filing No. 35.

**FINDINGS OF FACT**

Investigator Hanlin is employed by the NSP and has been involved with the Internet Crimes Task Force since 2002 (TR. 61-62). Investigator Hanlin is trained in online enticement investigations, including the use of software for Operation Fair Play (TR. 63).[1] On July 15, 2008, Investigator Hanlin obtained an internet protocol (IP) address in Columbus, Nebraska with a program entitled GNU Watch (TR. 16, 62).[2] Investigator Hanlin browsed the contents of the LimeWire shared file folder from that Columbus IP address with a computer program entitled Phex and located files containing child pornography on the computer (TR. 64).[3] Later that day, Investigator Hanlin was able to make a second connection to the Columbus IP address and found an additional file of child pornography (TR. 64). The list of files Investigator Hanlin obtained from the Columbus IP address on July 15, 2008, is evidenced by Exhibit 2 (TR. 66). Investigator Hanlin found seven matches for child pornography on the first search and changed the font on those matches to red (TR. 67). **See** Exhibit 2, lines 2, 21, 40-41, 44-46. Investigator Hanlin changed the font on the eighth match, found on the second search of the Columbus IP, to a purple color (TR. 67). **See** Exhibit 2, lines 8, 11, 12, 13, 15, 20, 30, 46. Investigator Hanlin was able to trace the Columbus IP address to Meysenburg (TR. 65).

Investigator Hanlin outlined his investigation in an affidavit and applied for a search warrant on August 4, 2008. **See** Exhibit 1. The search warrant was issued and executed on the afternoon August 4, 2008 (TR. 68). **See** Exhibit 1. Investigator Hitz and Columbus Police Department Detective Strecker (Detective Strecker), wearing plain clothes and driving an unmarked car, went to Meysenburg's place of employment and informed Meysenburg of the warrant to search his residence and requested that Meysenburg unlock the door so no damage would be done entering his home (TR. 69, 133-134). Meysenburg

---

[1] Operation Fair Play is a proactive FBI operation targeting the use of the Gnutella peer-to-peer network by individuals possessing and sharing child pornography (TR. 8).

[2] GNU Watch is a program in the Operation Fair Play toolkit that provides investigators with IP addresses suspected of containing child pornography (TR. 16).

[3] Phex and LimeWire are publicly available software utilized to browse shared file folders (TR. 17, 89).

accompanied Investigator Hitz and Detective Strecker to his residence where they were met in Meysenburg's driveway by Investigator Hanlin and NSP Sergeant Galen Svoboda (Sergeant Svoboda) (TR. 133). Investigator Hanlin showed his badge and identification to Meysenburg and informed Meysenburg that he was not under arrest (TR. 70). All officers were armed and their firearms were visible (TR. 88). Investigator Hanlin also informed Meysenburg that he was free to leave; however, Investigator Hanlin had a search warrant for Meysenburg's residence and requested Meysenburg unlock the door (TR. 70).

Meysenburg entered a combination code into a keypad and unlocked the door (TR. 70-71). After ensuring the residence was clear, the investigators led Meysenburg to the basement, where his computer was located (TR. 71). Investigator Hanlin asked Meysenburg if he knew why the officers were there and Meysenburg stated it had something to do with child pornography and that they would probably find it (TR. 71). While in the basement, Meysenburg made several other admissions to Investigator Hanlin, including statements that he was the only person living at the residence, he was the only person who used the computer, he used his computer to search and view pornographic images of individuals as young as eight years old, investigators would find child pornography in his shared file folder list, he had been looking at child pornography for a few years, and he was aroused as a result to viewing child pornography (TR. 72, 78, 80, 83). Additionally, Investigator Hanlin showed Meysenburg the video file obtained from the second search of Meysenburg's computer on July 15, 2008, and Meysenburg admitted to viewing the file on his computer (TR. 75-76).

Investigator Hanlin recorded his conversation with Meysenburg, beginning shortly after they entered the basement (TR. 84). **See** Exhibit 101. While Investigator Hanlin was interviewing Meysenburg, Investigator Hitz was inventorying and seizing Meysenburg's computer pursuant to the warrant (TR. 133). At no time was Meysenburg advised of his *Miranda* rights (TR. 97). Approximately half-way through the conversation between Investigator Hanlin and Meysenburg, Investigator Hanlin again informed Meysenburg that he was not under arrest and was free to leave (TR. 78). At no time during Investigator Hanlin's contact with Meysenburg did Meysenburg request an attorney (TR. 81).

Investigator Hanlin repeated to Meysenburg that he was not under arrest for the third time just prior to leaving Meysenburg (TR. 78).

At the hearing, Meysenburg testified he installed and uninstalled LimeWire approximately three times, but that he disabled the sharing function of LimeWire each time (TR. 141-142). However, Investigator Haugaard testified that a forensic examination of the computer indicated that the LimeWire program was configured to share files (TR. 22-23). Meysenburg does not dispute the evidence indicating that when the computer was seized, LimeWire was set to share files (TR. 164).

## LEGAL ANALYSIS

Meysenburg asserts the evidence obtained from the search of Meysenburg's computer on July 15, 2008, should be suppressed because the warrantless search constituted an invasion of privacy contrary to the Fourth Amendment. **See** Filing No. 23. Additionally, Meysenburg argues the statements he made to law enforcement officers on August 4, 2008, were involuntary and were made without being properly advised of the his rights under *Miranda* and should therefore be suppressed. **See** Filing No. 18. Accordingly, the court must resolve the following issues. First, the court must determine whether Meysenburg has standing to claim protection under the Fourth Amendment. Second, the court must determine whether statements made by Meysenburg, absent of any *Miranda* warning, were made voluntarily.

### A.   Standing

To claim Fourth Amendment protection, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable. *Minnesota v. Carter*, 525 U.S. 83, 88 (1998); *United States v. Boyster*, 436 F.3d 986, 992 (8th Cir. 2006). The reasonableness of the expectation of privacy must have "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Rakas v. Illinois*, 439 U.S. 128, 143-44 n.12 (1978); **see also** *Smith v. Maryland*, 442 U.S. 735, 740-41 (1979). "If a defendant fails to prove a sufficiently close

connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally." *United States v. Barragan*, 379 F.3d 524, 529-30 (8th Cir. 2004) (**quoting** *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994)).

The Eighth Circuit has recognized that:

> The Supreme Court has enunciated a two part test to determine whether a person has a legitimate expectation of privacy in the place searched or the object seized. A court must determine: (1) whether the petitioner has asserted a subjective expectation of privacy, and (2) whether the petitioner's subjective expectation is objectively reasonable.

*United States v. Stallings*, 28 F.3d 58, 60 (8th Cir. 1994) (internal citations omitted). "Fourth Amendment rights are personal rights that may not be asserted vicariously." *Barragan*, 379 F.3d at 529. Therefore, the court "must first determine whether [the defendant] had a legitimate expectation of privacy in the area searched or the item seized." *Gomez*, 16 F.3d at 256. The Eighth Circuit has explained:

> Factors relevant to the determination of standing include: ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

*Id.*

Here, Meysenburg asserts a right to privacy to the contents of his computer and argues that if the court finds a right to privacy to exist in contents of the computer, a search warrant would be required to access the files of the computer. Meysenburg testified he disabled the sharing function of the LimeWire program each time he installed it. However, the forensic evidence controverts Meysenburg's testimony. Upon a review of the LimeWire.props file, Investigator Haugaard testified, and the defendant admitted, that when the computer was seized, the LimeWire program was configured to share files on the Gnutella peer-to-peer network. *See* Exhibit 3. The court credits the testimony of Investigator Haugaard. If the program was configured to share files on a peer-to-peer network, those files can be accessed by the users of that network and Meysenburg cannot

assert a right to privacy to those files he elected to share. See *United States v. Ganoe*, 538 F.3d 1117, 1127 (9th Cir. 2008) (denying defendant's motion to suppress evidence on the grounds the defendant had installed file sharing software on his computer and "knew or should have known that the software might allow others to access his computer"). Meysenburg further contends it is possible a third party could have employed a virus or trojan to remotely access the computer and alter the settings of LimeWire to enable file sharing, but presented no evidence indicating such an event occurred. Rather, Meysenburg argues forensic analysis could not detect the use of a virus or trojan to remotely access his computer and alter its settings.

Meysenburg has failed to demonstrate he has an expectation of privacy in the files he was sharing via LimeWire. Investigator Hanlin was able to view only those shared files on July 15, 2008. The claim Meysenburg did not intend to share his files is directly contradicted by the evidence established by Investigator Haugaard. When Meysenburg's computer was seized and examined, the sharing function of LimeWire was indisputably set to share files. The theory advanced by Meysenburg that a virus or Trojan could have been employed by a third party to enable the sharing in Meysenburg's LimeWire program is not substantiated by any evidence and is without merit.[4] Therefore, the court finds Meysenburg does not have standing to challenge the warrantless search of the shared files on July 15, 2008.

**B.   Statements**

The Court must next examine whether Meysenburg's statements were made while subject to custodial interrogation. The Self-Incrimination Clause provides: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "[T]he core protection afforded by the Self-Incrimination Clause is a prohibition

---

[4] The term Trojan means a malware program, which surreptitiously runs on a computer, used to spy on computer users' activities (TR. 26). The forensic analysis of Meysenburg's computer using the McCaffey software program revealed a Trojan called "Generic Backdoor" installed five times on Meysenburg's computer (TR. 28-30). Meysenburg claims one of these Trojans reconfigured his computer for LimeWire by setting his computer to file sharing. While theoretically possible, there is no evidence to substantiate Meysenburg's claim. The evidence shows none of the Trojans affected LimeWire used by Meysenburg's computer (TR. 30-31). The court finds that no Trojan reconfigured Meysenburg's computer setting for LimeWire.

on compelling a criminal defendant to testify against himself at trial." *United States v. Patane*, 542 U.S. 630, 637 (2004).

> [I]n *Miranda*, the Court concluded that the possibility of coercion inherent in custodial interrogations unacceptably raises the risk that a suspect's privilege against self-incrimination might be violated. To protect against this danger, the *Miranda* rule creates a presumption of coercion, in the absence of specific warnings, that is generally irrebuttable for purposes of the prosecution's case in chief.

*Patane*, 542 U.S. at 639 (**citing** *United States v. Dickerson*, 530 U.S. 428, 434-35 (2000); *Miranda v. Arizona*, 384 U.S. 436, 467 (1966)).

"The requirements of *Miranda* arise only when a defendant is both in custody and being interrogated." *United States v. Londondio*, 420 F.3d 777, 783 (8th Cir. 2005).

> Not every confession obtained absent the *Miranda* warnings is inadmissible, however, because "police officers are not required to administer *Miranda* warnings to everyone whom they question. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited."

*United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (**quoting** *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). The "ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (internal quotation and citation omitted); *United States v. Elzahabi*, No. 08-1755, 2009 WL 538880, at *2 (8th Cir. Mar. 5, 2009).

The court must evaluate the objective circumstances surrounding the interrogation, and whether, under those circumstances, "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995); **see** *Stansbury v. California*, 511 U.S. 318, 322-23 (1994) (based "on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."). The Eighth Circuit has identified several factors, which act to mitigate or aggravate the custodial atmosphere,

7

used to determined whether an interview is custodial, however "an explicit assertion that the person may end the encounter". . . "provides an individual with a clear understanding of his or her rights and generally removes any custodial trappings from the questioning." *United States v. Ollie*, 442 F.3d 1135, 1138 (8th Cir. 2006). Some specific factors to evaluate are:

> 1. whether the police told the suspect he was free to leave, was free to refuse to answer questions, or was not under arrest;
> 2. whether the person's movements were unrestrained during the interview;
> 3. whether the person either initiated contact with authorities or voluntarily acquiesced to official requests;
> 4. whether the police used coercive or deceptive tactics that restricted the suspect's freedom to terminate the encounter; and
> 5. whether the questioning occurred in a police-dominated atmosphere.

*Id.* at 1137.

"Interrogation in the *Miranda* context refers to express questioning and to words or conduct that officers should know is 'reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Briones*, 390 F.3d 610, 612 (8th Cir. 2004) (**quoting** *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). Meysenburg was undoubtedly interrogated. Investigator Hanlin asked specific questions with the intent of eliciting incriminating responses. However, *Miranda* requires both custody and interrogation.

Meysenburg argues a reasonable person would not have felt free to leave under the circumstances he faced. Specifically, Meysenburg asserts he was subject to a custodial atmosphere by being removed from work, escorted several blocks from his place of employment, and questioned in close quarters in the presence of multiple armed law enforcement officers. However, Meysenburg was expressly informed three times that he was not under arrest and that he was free to leave at any time. When Investigator Hitz and Detective Strecker picked Meysenburg up from his place of employment, they informed him they had a search warrant for his home and requested he accompany them there so that no damage would be done in entering Meysenburg's home. When Meysenburg arrived at his home, while standing in the driveway, Investigator Hanlin informed Meysenburg for the

first time that he was not under arrest and was free to leave. Approximately half-way through the interview of Meysenburg conducted by Investigator Hanlin in Meysenburg's basement, he was informed for a second time that he was not under arrest. Finally, at the conclusion of the interview, Meysenburg was informed for the third time he was not under arrest.

Meysenburg was informed three times he was not under arrest and was not arrested on August 4, 2008. There is no evidence the officers retrained Meysenburg's freedom of movement or used deceptive practices or coercion. While there were several officers present during the search, only two officers approached Meysenburg at his place of employment. Additionally, the officers requested, but did not need, Meysenburg's presence at the home during the search. Based on the combined factors present, the court finds Meysenburg was not in custody on August 4, 2008. Therefore, the court concludes the officers were not constitutionally obligated to advise Meysenburg of his *Miranda* rights and under the circumstances, the court finds Meysenburg's August 4, 2008 statements were voluntarily given. Upon consideration,

**IT IS RECOMMENDED TO CHIEF JUDGE JOSEPH F. BATAILLON that:**

Jeffrey J. Meysenburg's motions to suppress (Filing Nos. 18, 23) be denied.

**ADMONITION**

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) business days after being served with a copy of this Report and Recommendation. Failure to timely object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 16th day of March, 2009.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge